**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN D1STRICT OF MISSISSIPPI**
**DELTA DIVISION**

**LOUIS BAILEY**                                                                **PLAINTIFF**

**VS.**                                                    **CIVIL ACTION NO. 2:08CV253-P-S**

**DOLGENCORP, LLC,**
**and JOHN DOES 1-10**                                                          **DEFENDANTS**

**PLAINTIFF'S MEMORANDUM**
**BRIEF IN SUPPORT OF HIS OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.**
**INTRODUCTION**

_____The Plaintiff, Reverend Louis Bailey, submits his Memorandum Brief in Support of his

Opposition to Defendant's Motion for Summary Judgment.  Because he was terminated for engaging

in protected activity, filing an EEOC complaint, this Motion should be denied.

**II.**
**FACTS**

_____**A.  REVEREND BAILEY'S JOB AS A LOADER**

The Plaintiff, Reverend Louis Bailey, an ordained Baptist minister, began his employment with

Dollar General Corporation (DG) on July 6, 1999, as a loader.  That job consists of removing freight

from a conveyor belt and placing it in the trailer of a truck.  (Bailey Dep., p. 42)[1]  He worked with

several other persons who performed certain job duties in connection with loading the trucks that

deliver the freight to the stores.  For instance, his immediate supervisor's job was to check for loading

qualities including the rolltainers. (Reed Dep., p. 14).  Once the truck is loaded, the yard jockey closes

---

[1] All Exhibits are attached to Plaintiff's Opposition to Defendant's Motion for Summary Judgment.

the truck's door and removes it from the dock.  (Bailey Dep., p. 50) The guard breaks the seal on the loaded truck when it is brought to the outbound gate and then opens the truck door.  (Sykes Dep., p. 23).  The guard then inspects the freight from right to left and top to bottom to make sure the load is strapped properly, nothing is on the floor, and nothing is falling.  (Sykes Dep., pp. 18-19).  The guard is specifically required to determine if the straps are tight by pulling on them and the  rolltainers.  (Sykes Dep., p. 23).   In addition to these employees, DG assigns trainers to new employees, including loaders.  (Caffey Dep., p. 9)   The trainers supervise all work done by the loader trainees and makes sure they follow the company's standard operating procedures.  (Caffey Dep., pp. 9, 13-14).   The trainer is with the trainee from the beginning of the loading until it is completed. (Reed Dep., pp. 31-32)  Reverend Bailey had worked with DG for nine years when his employment was terminated on March 12, 2008.  (Bailey Dep., Exh. 4)   According to DG, the termination was in conformity with its progressive disciplinary policy and was due to his failure to properly load a truck on or about March 6, 2008.  *Id.*

##       B.  DG'S PROGRESSIVE DISCIPLINARY POLICY AND POLICY TO INVESTIGATE

DG's disciplinary program consists in part of a progressive counseling system.   Under this program, an employee charged with a violation of company policy first receives a verbal warning.  (Smith Dep., p. 20) He receives a written warning for the next violation, a final warning for the next, and then termination.   *Id.*  Larry Smith would usually get involved at the written stage and conduct an investigation to ensure that the employee is being treated fairly.  (Smith Dep., p. 24) This investigation is required by company policy and the review process.   (Sandifer Dep., p. 18) The extent of the investigation depends on the nature of the violation.   *Id.*   A final decision is made once all of the information is gathered from all of the parties involved.  (Sandifer Dep., p. 25)  In addition to DG's policy of investigating charges made against employees, it also has what it calls an open door policy.

(Sandifer Dep., p. 20) Under this policy, management is available to discuss any concern, challenge or issue the employee may have.  (Sandifer Dep.,  p. 20-21)

## _____C. DG'S PROGRESSIVE DISCIPLINARY POLICY AND POLICY TO INVESTIGATE

DG has a General Anti-Discrimination and Harassment Policy which provides that "[h]arassment is speaking to or treating *an employee* in a way that is degrading or in a way that exhibits dislike for, hostility or hatred toward, an individual (or that of his /her relatives, friends or associates) because of race, color, religion, sex ... national origin, age, disability, citizenship or any other characteristic protected by law."  (Bailey Dep., Exh. 7) (Emphasis added)  During the first few years of employment with DG, Reverend Bailey was asked to pray at company functions such as Christmas, Thanksgiving, when tragedies struck employees or their relatives and loved ones, and during the aftermath of 911[2].  (Bailey Dep., p. 63).    In fact, on at least one occasion,  the facility's Plant Manager, Roy Sandifer, asked him for prayer.  (Bailey Dep., p. 65).  Mr. Sandifer also allowed him to pray with other employees every morning before work began.  (Bailey Dep., p. 69)

These sessions continued until 2007 when DG's Outbound Manager, Donna Azar, stopped them because she claimed the participating employees were taking too much time in the break area. (Bailey Dep., p. 70).  Apparently, what the Anti-Discrimination and Harassment Policy proscribed changed sometime after Larry Smith arrived as he believed that many people are not religious and might be offended by people preaching to them, and therefore, it is not allowed in the work place. (Smith Dep., p. 28).  According to Smith, an employee can violate company policy regarding religion even if he does not realize he is offending the other person.  (Smith Dep., p. 31) An employee runs the risk of being charged with harassment by just speaking about religion if the other person objects.

---

[2]Other ministers, including James Kemp and Adam Blake also prayed at various times. (Bailey Dep. p., 66)

(Smith Dep., p. 62) Consequently, if a person has "a problem with [another's] beliefs and it [becomes] an argumentative issue, ...now [it] has become harassing to the other individual." (Smith Dep., p. 30) Around this time, Reverend Bailey also noticed a change in Roy Sandie's attitude towards him as he rarely talked with him as he had in the past. (Bailey Dep., p. 171) On several occasions, he and Larry Smith told Reverend Bailey to leave his religion out of the work place. (Smith Dep., p. 106)

### D. EARLY DISCIPLINARY COUNSELINGS

During the first years of his employment with DG, Reverend Bailey was the subject of several disciplinary actions that were taken against him in connection with his employment. In one such instance on October 25, 2004, he had a $100 bill that a fellow employee, Brenda Davis, snatched from his hand. (Bailey, Dep., p. 151) When she would not return it, he asked his supervisor to request that she do so. *Id.* When the supervisor made this request, she accused Reverend Bailey of harassment. *Id.* He received a final counseling as the result of this incident. *Id.*

In another incident that took place on April 4, 2005, a fellow employee complained that Reverend Bailey made disparaging remarks about the Pope. (Bailey Dep., p. 151) According to Reverend Bailey, however, during his break, he was asked what he thought about the Pope's death and he replied not too much. *Id.* He had no idea that anyone would be offended by this remark and apologized when he learned otherwise. *Id.* As a result of this incident, he was given a final counseling. (Smith Dep., Exh. 10) From the time of that written counseling, April 7, 2005, until January, 2007, he had no further verbal or written counsels. (Smith Dep., Exh. 10)

### E. THE 2007 COUNSELINGS AND THE EEOC COMPLAINT

On the fifteenth of January, 2007, he was charged with "fail[ing] to follow proper loading

procedure ..., thus creating a basted[3]."  (Bailey Dep., Exh. 2)  The counseling further stated that "[the next shift had to restock this batch in order to load the next batch...this prevented the next shift from being set up for success."  *Id.*  Reverend Bailey disagreed with this counseling and refused to sign it[4]. The loaders on the next shift who tried to save the trailer from busting out did not receive a counseling. (Smith Dep., p. 37)  This failure is significant because Reverend Bailey received another counseling on February 26, 2007 in which he attempted to save a trailer from a bust out that the prior shift began to load.  (Bailey Dep., Exh. 2) According to this counseling, he created a bustout  and also loaded damaged freight which was against the SOPs.  *Id.*  As a result, the trailer was moved to another loading door and "reworked by [another employee] and all freight was loaded."  *Id.*

Reverend Bailey refused to sign the February counseling because his supervisor, Theresa Winters, told him to load the damaged freight on the truck and to strap it down.  (Bailey Dep., p. 88) Despite following his supervisor's directive and advising his manager, Donna Azar, of same, he still received a written counseling.  (Bailey Dep., pp. 88-89, 98)  Additionally, "someone [on the first shift] started the load and Louis Bailey was to rework the trailer."  (Smith Dep., pp. 43, 45) Tyrone Griffin, another loader, saved the trailer from busting out when he reworked it after it was moved away from the door.  (Smith Dep., pp. 39, 45) Although Tyrone Griffin saved the trailer, "it is not always possible to save a trailer from a bustout."  (Kemp Affidavit) Doing so, however, "is much more complicated when freight is still being directed to a trailer as opposed to when the trailer is moved away from the loading dock where the freight can be removed from the trailer and reworked."  *Id.*

_____

[3]A bustout occurs when the loader fails to get all of the designated freight on the trailer. (Reed Dep. p. 18)

[4]Frequently, employees feel that if they do not sign, the counseling will not count against them.  (Reed Dep. p., 52)  It is their way of expressing disagreement with the counseling.  *Id.* at 53.  Non-management employees were not counseled regarding the significance of signing the counselings.  *Id.*

In March, 2007, Theresa Winters, came to Reverend Bailey's trailer and told him she was sick. (Bailey Dep., p. 71; Smith Dep., Exh. 10). She returned that afternoon while another supervisor, Kevin Chestnut, was also present and appeared to be ill. (Bailey Dep., p. 72) He asked her if she wanted him to pray for her, extended his hand, she put her hand in his, and he prayed for her. *Id.* Sometime later, Kevin Chesnut told him the prayer made her uncomfortable and he apologized for the prayer. (Bailey Dep., p. 72; Smith Dep., Exh. 10)

Approximately one week later, as Reverend Bailey was leaving work to attend his aunt's funeral in St. Louis Missouri, Larry Smith stopped him and asked if he had prayed for Theresa Winters and he answered yes. (Bailey Dep., p. 74) When he returned to work several days later, Smith called him into his office and fired him for praying for her. *Id.* Although Donna Azar claims Ms. Winters reported the incident to her almost immediately after it happened, the only written statement Ms. Winters gave regarding this incident indicates she did not. (Smith Dep., Exh. 10)   It shows that she only reported the incident with Reverend Bailey because she was concerned about harassment from other employees, including Donna Azar, and not with Reverend Bailey. (Smith Dep., Exh. 10). In fact, the ADR findings state that:

> Mrs. Winters primary complaint to HR, as outlined in her written statement, was not related to Mr. Bailey, rather it was against Florence Sims, Dorothy Cooper and Donna Azar. Ms. Winters included the incident with Mr. Bailey in her statement *to provide background information* into alleged inappropriate comments made to her by Florence Sims and Dorothy Cooper.

(Smith Dep., Exh. 10) (Emphasis added)

Thus, Mrs. Winters did not report this incident to anyone and it only came to the attention of the HR Department because of her complaints against Florence Sims, Dorothy Smith and Donna Azar. *Id.* There is no reference to her reporting this incident to Donna Azar, Larry Smith or anyone else. *Id.* Her statement is perfectly clear that she only spoke to Kevin Chesnut about this incident:

Kevin Chestnut was standing there when this happened so afterward I asked Kevin how to approach Mr. Bailey and ask him not to do that again, since I do not have the same beliefs and it made me uncomfortable. *I did not want to offend Mr. Bailey* so Kevin spoke to him about it. *It has since been told around the department* what happened and on Thursday March 15 and on Wednesday March 21ˢᵗ a couple of different times *each day* Florence Sims and Dorothy Cooper have made a point to make comment out loud whenever I enter the shipping office that God would take care of those people who did not believe and that [they] just did not know how anyone with any brains could not believe in God.

*Id.* (Emphasis added) Thus, Ms. Winters reported this incident to HR to complain about the conduct of three other employees, including Donna Azar. *Id.* ADR determined that Kevin Chesnut told Florence Sims and Dorothy Cooper about this incident. *Id.* Consequently, Smith "verbally coached Kevin Chesnut about keeping his mouth shut for telling other people about this incident."[5] *Id.* Thus, Ms. Winters's account of the incident supports Reverend Bailey's contention that she did not complain to management about the prayer. (Bailey Dep., p. 76)

This finding is in direct contrast to claims made by Donna Azar about how she learned of this incident. She claimed that Ms. Winters walked into her office and she "was crying, shaking, visibly upset at Mr. Bailey. (Azar Dep., p. 41) According to her, he crossed the line "when he actually stopped working, turned around, and put his hands on her and started praying very loudly, ... to save her." (Azar Dep., p. 48) She claimed Reverend Bailey "was saving her, that she was feeling bad because of her way of living, and, you know, the devil being in her, and that kind of ... he was saving her." *Id.* Again, not one of these accusations is supported by Ms. Winters' statement or any other

---

[5]While Donna Azar and Larry Smith felt it was necessary to terminate Reverend Bailey's employment for his alleged harassment in praying for Ms. Winters when she stated she was sick, there was no such compulsion to terminate the employment or discipline the person who shared the information regarding the incident, Kevin Chestnut, and the persons who harassed Ms. Winters by denigrating her beliefs about God, Florence Sims and Dorothy Cooper. Ms. Winters' statement shows that Reverend Bailey's efforts were only to aid her with her illness while their actions were to harass her.

information or documentation connected with this incident.

Reverend Bailey was aggrieved by the termination and filed a complaint with the EEOC alleging that he was fired for praying for Ms. Winters in violation of his right to be free of racial and religious discrimination. (Bailey Dep., p. 76)  He also complained to ADR.  The ADR subsequently determined that the incident did not warrant termination and he was allowed to return to work. (Smith Dep., Exhibit 10)

Despite ADR's determination, upon his return to work, Donna Azar, gave him another written counseling for violation of the company's Anti-Harassment Policy in connection with his praying for Ms. Winters.  (Smith Dep., Exh. 9) The counseling stated that he "touched another employee and acted in a manner that was determined to be un-welcomed." *Id.*   The counseling provided that it "will not expire." *Id.*   Apparently, Donna Azar made it her personal mission to impose this sanction even though "no such counseling exists" within the company.  (Smith Dep., Exh. 10)

Upon his return to work, Donna Azar and Smith told him he was being put on a final counseling for an improperly loaded truck that he worked prior to his termination.  (Bailey Dep., p. 84) Because he needed his job, he agreed to the final counseling and signed it.  (Bailey Dep., p. 85)  The counseling was presented to him on April 30, 2007.  (Smith Dep., Exh.  4) DG claimed it did not give this counseling to Reverend Bailey because he had been off work as a result of his termination.  (Smith Dep., p. 51) However, the incident was reported on March 16, 2007, the write up occurred on March 20, 2007, and Reverend Bailey worked four days before being terminated in connection with the incident with Ms. Winters.  (Smith Dep., p. 50; Exhs. 4 &5) Thus, it could have been presented on either of the four days he worked before he was fired.  Within a week of his return, Roy Sandifer told him the EEOC saved him this time, but they would not be able to the next time.  (Bailey Affidavit) Larry Smith also mentioned the EEOC complaint after his return. *Id.*

In addition to the dilatory presentment, Dwayne Johnson, the employee who worked the trailer with Reverend Bailey, was never given the March 16, 2007 counseling. (Smith Dep., p. 61) He was supposedly not served because he was out on workers' compensation leave. (Smith Dep., p. 61; Exh.15) However, it was not given to him upon his return to work. (Smith Dep., Exh. 15) Furthermore, Reverend Bailey's and Dwayne Johnson's supervisor failed to notice the allegedly improperly loaded truck, but there is no evidence that this supervisor was ever counseled about this incident. (Smith Dep., p. 59) Neither is there any evidence that the guard who inspected the truck received any counseling. *Id.*

### F. THE MARCH 2008 FIRING AND REFUSAL TO INVESTIGATE

On March 12, 2008, approximately one week before Reverend Bailey's final counseling was to expire, he was again terminated for an alleged improperly loaded truck. (Smith Dep., Exh. 11) According to the store manager, Wanda Welch, she "broke the seal on the truck and went back inside the store." (Bailey Dep., Exh. 11) Sometime thereafter, "[t]he truck driver came inside and got me because he had something to show me." *Id.* She returned to find approximately 15 cases of merchandise on the ground and as far as she could see into the truck there were boxes stacked all the way to the top that were not in rolltainers. *Id.* None of this merchandise was in rolltainers and she could not see any. (Bailey Dep. Exh. 11)

Reverend Bailey's supervisor, Bonnie Reed, investigated this incident and determined from batch sheets that the trailer was loaded by Reverend Bailey and Shaler Davis, a trainee. (Reed Dep., p. 27) This determination was the total extent of the investigation. (Reed Dep., p. 29) She did not talk to Reverend Bailey, the guard, Shandy Sykes, the yard jockey, the other loader, Shaler Davis, or his trainer, Robert Caffey, or the truck driver. (Reed Dep., p. 40)

Shanda Sykes was the guard who inspected the truck before it left the premises. (Sykes Dep.,

p. 26) While the truck went out on March 6, 2008, and Reverend Bailey was fired on March 12, 2008, Shanda did not give a statement regarding the truck until April 17, 2008, almost six weeks after the trailer went out and one month after Reverend Bailey was fired.  (Sykes Dep., Exh. 2) She stated that "the straps were properly strapped and the rolltainers were tight when she released the trailer." (Sykes Dep., p. 26) She was sure that nothing was wrong with the truck when it left the premises.  (Sykes Dep., p. 34)

Robert Caffey was Shaler Davis' trainer when he and Reverend Bailey loaded the trailer in question.  (Caffey Dep., p. 13)   Caffey supervised all of Shaler Davis' work and would have noticed an improperly loaded truck.  (Caffey Dep., p. 15) He never saw such a truck, but no one talked with him about it.  (Caffey Dep., p. 17)  He remembers Reverend Bailey and Shaler Davis loading a truck in March, 2008, and that it was not improperly loaded.  (Caffey Dep., p. 16)

Shaler Davis was also assisting Reverend James Kemp with loading another trailer which was next to the trailer involved in this case.  (Azar Dep., Exh. 12) Reverend Kemp remembers the loading of this truck and it was not improperly loaded. (Kemp Affidavit)

It is clear that Bonnie Reed failed to investigate and Donna Azar, the manager, failed to require one.  She failed to request an even cursory investigation even though she knew that trailers are sometimes damaged after they leave the yard and the drivers will say the straps broke.  (Reed Dep., pp. 42, 44)   At other times, the straps are damaged and become loose and when that happens, the rolltainers fall and damage the merchandise. *Id.*  Nevertheless, no investigation was made to determine if there was an equipment malfunction.  *Id.*  She also knew that this truck was loaded with rolltainers because she would have noticed if it was not.  (Reed Dep., pp. 62, 63) She was not aware of any truck being loaded with rolltainers on her watch.  (Reed Dep., p. 68)

Reverend Bailey denied loading the truck improperly when he was first told about this trailer

which was the same day he was fired.  (Bailey Dep., p. 114) He told his supervisor, Bonnie Reed, and

manager, Donna Azar, that he did not load the truck improperly. *Id.*   Donna Azar told him she would

investigate, but there is no evidence she did.  (Bailey Dep., p. 117) Rather than make any attempt to

determine the validity of his denial, she fabricated evidence that would indicate that he did improperly

load it by claiming he signed the "load with pride placard" that allegedly accompanied the trailer.

(Azar Dep., p. 98).  This claim has no validity as Bonnie Reed stated that "up until the incident with

Reverend Bailey, [she was] not putting the ... placards with pride" in the trucks.  (Reed Dep., p. 25)

Reverend Bailey also told Larry Smith he did not load the trailer improperly but the decision to

fire him had already been made.  (Smith Dep., p. 97) He also appealed to Mr. Sandifer who then talked

with Donna Azar a few minutes.  (Bailey Dep., p. 124) When he returned from this talk, he told

Reverend Bailey the termination would stand.  *Id*.   Mr. Sandifer then told him to look to the hills from

whence his help comes and not to him.  *Id.*  "He [Roy Sandifer] was mocking me as a Christian telling

me to look to God, don't look to him for help."  *Id*.

Thus, there was no investigation to determine if Reverend Bailey actually committed the

infraction.  This failure to investigate was against DG policy, but it is not surprising given the animus

shown toward Reverend Bailey.  According to Donna Azar, he was a man of the cloth and liked to give

sermons.  (Azar Dep., p. 38); she allegedly had conversations with Reverend Bailey about sermons on

the floor because it affected his work (Azar  Dep., p. 52); she claims he would come to her office

everyday even though freight was still coming down the line for 5 to 20 minutes (Azar Dep., p. 111);

He preached sermons while employees were working (Azar Dep., p. 55); He would preach to 2 or 3

employees off the lines beside him, while the lights were turning red because the freight was not going

into the truck. (Azar Dep., p. 113)

Donna Azar claims Reverend Bailey preached sermons often enough that she could not count

them on both hands.  (Azar Dep., p. 113)   He preached sermons an average of at least once per month. (Azar Dep., p. 114) She claims that supervisors Kevin Chesnut, Florence Sims, Bonnie Reed, and Kelvin Givens, all saw Reverend Bailey preaching sermons during working hours.  (Azar Dep., pp. 115-117)  Inexplicably, however, she never gave him a counseling for preaching sermons.  (Azar Dep., p. 113-114) In addition, none of the supervisors who allegedly saw him preaching sermons gave him a counseling of any kind. (Azar Dep., pp. 115-117)   Neither were counselings given to any of the employees who allegedly left the lines and listened to the sermons.  (Azar Dep., p. 114)

Reverend James Kemp worked with Reverend Bailey for a number of years as a loader and never saw him preaching sermons and never heard of him doing so. (Kemp Affidavit) Furthermore, if a loader left his work location for five or more minutes while freight was still coming down the conveyor belt , all of the lines would shut down and the loader would receive a counseling for a 100% light, meaning that the loading operation was completely shut down.  *Id.*  In other words, preaching sermons as Donna Azar claims did not happen and would not happen because of the resulting consequences.

### III.
### ARGUMENT

**_____A. THE SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when there is no genuine issue as to a material fact and the moving party is entitled to judgment as a matter of law.  *Long v. East field College,* 88 F.3d 300, 304 (5th Cir. 1966).  "A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir. 2004).

In ruling on summary judgment motions, the evidence of the non-movant is to be believed, and

"the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) To defeat a motion for summary judgment or a motion for judgment the plaintiffs must show that there is a " 'conflict in substantial evidence' " on the ultimate issue. *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir.1996) (en banc) (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 375 (5th Cir.1969) (en banc)). Evidence is "substantial" if it is "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Reavis v. East field College,* 88 F.3d 300 308 (5th Cir. 1996)  *quoting Boeing Co.*, 411 F.2d at 374.  Reviews of grants of summary judgment are de novo. *Mason v. United Air Lines, Inc.,* 274 F.3d 314, 316 (5th Cir. 2001).

### B.  PLAINTIFF'S PRIMA FACIE CASE

To establish a *prima facie* case of retaliation, "an employee must show (1) that [he] engaged in a protected activity; (2) that an adverse employment action occurred; and (3) that a causal link exists[  ] between the protected activity and the adverse action."  *Baker v. American Airlines, Inc.,* 430 F. 3d 750, 754 (5th Cir. 2005); *Reavis v. East field College,* 88 F. 3d 300, 301 (5th Cir. 1996).

An employee is engaged in protected activity if he has either (1) "opposed any practice made an unlawful employment practice" by Title VII or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII, 42 U.S.C. § 2000e-3(a). The employee must also show that he had at least a "reasonable belief" that the practices he opposed were unlawful. *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir.1981). Once the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id.*  If the defendant introduces evidence which, if true, would permit the conclusion that the adverse employment action was

nondiscriminatory, the focus shifts to the ultimate question of whether the defendant unlawfully retaliated against the plaintiff. *Id.*  "[O]nce the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive." *Reavis v. East field College,* 88 F.3d at 305; *See McCoy v. City of Shreveport* , 492 F.3d 551, 556 562  (5th Cir. 2007)

### 1. Reverend Bailey Engaged in Protected Activity and Suffered an Adverse Employment Decision

An employee's filing of an EEOC charge is clearly a protected activity. *Walker v. Thompson,* 214 F.3d 615, 629 (5th Cir. 2000)  In addition, termination is clearly an adverse employment action. *Id.* There is no dispute that Reverend Bailey filed an EEOC complaint and that termination constitutes an and adverse employment decision.  Therefore, Reverend Bailey meets these two prongs of the prima facie case inquiry.

Reverend Bailey belief that he was being discriminated against because of his religion was reasonable.  First, he was given a final progressive counseling for answering a question regarding his opinion about the Pope's death.  (Bailey Dep., p. 151) This counseling was given to him even though the Anti-Harassment Policy provides that  "[h]arassment is speaking to or treating *an employee* in a way that is degrading or in a way that exhibits dislike for, hostility or hatred toward, an individual (or that of his /her relatives, friends or associates) because of race, color, religion, sex ... national origin, age, disability, citizenship or any other characteristic protected by law."   (Bailey Dep., Exh. 7) (Emphasis added) He only gave an opinion when asked to do so by a fellow employee and his statement did not treat an employee in any degrading manner or exhibit any dislike for her, her relatives, friends or associates.  Based on the policy's clear language, he believed he had not violated any proscription contained in it.

In addition to this incident, the Plant Manager, Roy Sandifer, and the Human Resource Manager, Larry Smith, told Reverend Bailey on a number of occasions to keep his religion away from the workplace.  They told him this on these occasions even though before the incident with Theresa Winters, there was only one documented complaint about any religious activity regarding him.  He also had ample reason to believe that Donna Azar was hostile to his religion as she stopped the morning prayer that had been allowed by the Plant Manager.  This belief about her hostility was confirmed by the fact that upon his return from his termination in connection with the Winters incident, she put in a provision in the counseling that it would not expire.  There was no such counseling in the company's policy.  In addition, Donna Azar's claims that Reverend Bailey conducted sermons which caused the line to shut down numerous times without ever incurring any kind of counseling for same is not worthy of belief.    It is an indicative, however, of why he believed his religious beliefs played an impermissible  part in the decision to terminate him.

DG cites *Wilson v. U. S. West Communications,* 58 F.3d 1337 (8th Cir. 1995), for the proposition that "Title VII does not require an employer to allow an employee to impose his religious views on others."  While this is true, "an employer is required to 'reasonably accommodate' the religious beliefs of their employees unless doing so would cause the employer undue hardship." *Id.*  at 1340.  Thus, an employer is not allowed to preclude all religious activity which is in connection with the sincerely held beliefs of the employee.  Furthermore, in *Wilson,* the employer did not oppose the employees views, it only objected to her wearing an anti-abortion button with a color photograph of a twenty-week old fetus with the phrase "stop abortion."  *Id.* at 1339, 1341.  Some employees were offended and threatened to walk of the job if she continued to wear it.  *Id.* at 1339.  Because the employee refused the employers attempts to accommodate her beliefs and not offend its other employees at the same time, the court found such attempts were reasonable, and therefore, termination

was proper. *Id.* at 1341-1343.

There were no such problems in this case. The evidence shows that Reverend Bailey never attempted to impose his views on any employee. In fact, he prayed for Theresa Winters only after she came to him, an ordained minister, that morning and told him she was sick. When she returned that evening and appeared to be ill he extended his hand and she put hers in his and he then prayed for her. It was very easy for him to construe her advising him of her illness as a call for help. It is also common knowledge in such a setting, an extension of a minister's hand indicates that prayer is forthcoming. She could have easily withheld her hand and indicated she did not desire his help. Rather than do so, she extended it. In the other instance, he only answered a questioned that was posed to him by a co-worker concerning the Pope's death.

There is no evidence that Reverend Bailey attempted to impose his views on anyone. In fact, in the nine years he worked at DG, these are the only two documented incidents involving him which was in any way connected with religion. Furthermore, Theresa Winters only included this incident in a report to provide background information in connection with her complaint against three other employees, including Donna Azar. It is clear that she never intended to lodge a complaint against Reverend Bailey. It is equally clear that management seized upon this opportunity to terminate his employment

Clearly, when viewed in the light most favorable to him, and with all reasonable inferences and ambiguities resolved in his favor, there is little doubt that his belief that he was discriminated against because of his religion, was reasonable.

### 2. There was a Causal Connection Between Reverend Bailey's Filing of the EEOC Complaint and his Subsequent Firing

To determine the existence of a causal link, the court looks to three factors: "(1) the employee's

past disciplinary record, (2) whether the employer followed its typical policy and procedures in terminating the employee, and (3) the temporal proximity between the employer's conduct and termination." *Newline v. Resolution Trust Corp.,* 33 F.3d 498, 508 (5th Cir. 1994).  At the prima facie stage of the case, however, the causal link requirement does not rise to the level of a "but for" standard. *Id.  Gee v. Principi,* 289 F.3d 342 , 345 (5th Cir. 2002)  The plaintiff "*need not prove* that his protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a prima facie case." *Long v. East field College.,* 88 F.3d 300, 305 n. 4 (5th Cir.1996) (citation omitted) (emphasis added).

   a. **Reverend Bailey's past disciplinary record**

   While it might appear at first blush that Reverend Bailey did not have a stellar prior disciplinary record, it is somewhat deceiving.  Although he did have several writeups prior to 2005, after his writeup involving his comments about the Pope, he had no verbal or written counsels  from April 7, 2005 until January 15, 2007.  (Smith Dep., Exh. 10) Despite an almost two year period in which he was free of any violations, all of sudden in January 2007, he somehow forgot how to load, and then incurred counsels in January, February, and March, 2007.  With respect to the January 2007, counseling, he was charged with failing to follow proper loading procedures, creating a bustout, and thus causing the next shift not to be successful.  Although he was given a counseling for this incident, the next shift was not when they were unable to save the truck.

   In February 2007, Reverend Bailey and his supervisor noticed a trailer loaded by the previous shift was in danger of busting out.  His attempt to save this truck was not successful, but he was given a counseling for his inability to do so.  Thus, unlike the loaders on the second shift that unsuccessfully attempted to save the January 2007 trailer, Reverend Bailey was given a counseling.  This counseling was issued even though his supervisor told him to load the truck and he did so in the manner she

indicated.

The March 2007 counseling involved another counseling in which load quality was involved. He has no recollection of this truck and denies loading this truck improperly. He did not receive this counseling until after his return to work after his termination in connection with the Theresa Winters incident. He was not given the counseling until his return even though there were at least four days he worked after the counseling was prepared and allegedly ready to be presented to him. Yet it was only presented after his complaint to the EEOC and ADR's decision to reinstate him. Curiously, the person who worked the trailer with Reverend Bailey, was never presented with his counseling. The initial explanation for not doing so was that he was out because of an injury on the job. But the records show that it was never given to him and he eventually left the company in November, 2007. It was based on this counseling that Reverend Bailey was on a final counseling.

Despite what appears to be a systematic attempt to discredit him, he returned to work and was free of any violations for almost an entire year when his final counseling would have ended. It was at this time, in March 2008, that he was charged with improperly loading another truck. Although, Donna Azar admits that Reverend Bailey knew how to load and would do when under the cloud of a final counseling, he inexplicably decided to improperly load a truck when his final counseling would have ended in a few days. For him to do so, makes no sense whatsoever and he denies improperly loading this truck and he is supported by all others who had some contact with this particular truck.

### b. **DG did not follow its typical policy for terminating employees**

DG did not follow its typical policy in terminating Reverend Bailey. It was DG's policy not to take any adverse action against an employee that did not commit the infraction lodged against him. Therefore, an investigation would ensue to make sure the employee was guilty of the charges. The Plant Manager, Roy Sandifer, followed this policy and stated that he would not punish an employee for

something he did not do.  According to Sandifer, and the HR manager, Smith, DG"s open door policy allowed employees to discuss any issues or concerns they might have concerning their employment. This policy was supposed to be available when something as dire as termination was contemplated.

Reverend Bailey did not receive the benefit of DG's policy to investigate or the open door policy.  He told his supervisor, Bonnie Reed, that he did not load the March 2008 truck improperly, but she still failed to do any investigation.  She failed to investigate when she knew that freight could be damaged because of defective straps and mishandling by the truck drivers themselves.  She failed talk with the loader in the next lane who was in a position to see and did state that the trailer was loaded properly.  She failed to talked with the trainer of the loader assisting Reverend Bailey or the guard who inspected the trailer before it left the gate.  All of these persons saw this truck observed that it was not properly loaded.  She also knew that contrary to the store manager's description of the truck, it was indeed loaded with rolltainers.

Nevertheless, Reverend Bailey's pleas to investigate was to no avail.  Donna Azar claimed she would investigate but there is no evidence that anyone did anything except check the batch sheets. Despite her experience in loading, she claims to never have considered that anything other than an improperly loaded truck caused its condition.  Larry Smith talked to him but he had already made up his mind about the termination.  (Azar Dep.,  p. 99)  Finally, Roy Sandifer talked with Donna Azar and said the termination would stand.   He then told Reverend Bailey to look to the hills for his help and not to him.

Thus, DG did not follow its procedures for employees, such as Reverend Bailey, who believed they were being unfairly treated.  Rather than making sure that management was available to carry out these policies given the severe consequences involved, they refused to do so.  Therefore, a reasonable jury could believe that such refusal was connected to his previous filing of the EEOC complaint.  Such

a belief is made more plausible when it is considered that Roy Sandifer told Reverend Bailey the EEOC would not be able to save him the next time; Larry Smith mentioned the EEOC complaint to him; and Donna Azar made the unsubstantiated allegations about 5-20 minutes sermons that were given and her claims about how the incident with Theresa Winters took place which totally contrary to her account of what actually happened.

**c. There is a temporal proximity between DG's conduct and Reverend Bailey's Termination**

In *Hill v. Chrysler First, Inc.*, 970 F.2d 39 (5th Cir. 1992), the Fifth Circuit ruled that "the district court considered the lapse of time, but found that it did not absolve defendant of its responsibility for retaliating against the plaintiff for her filing the EEOC claim."  It further stated that the court "properly weighed the lapse of time as *one of the elements* in the entire calculation of whether Shirley had shown a causal connection between the protected activity and the subsequent firing." *Id.* at 346.  (Emphasis added) Therefore, despite a  fourteen-month lapse in time between the filing of the EEOC complaint and the termination, the court still properly found a causal connection between the two. *Id.* at  44.

While Hill is distinguishable from this case in that her work record was free of any infractions, it still shows that in a proper case, a causal connection can be shown despite a twelve month difference in time between the filing and the termination, as in this case.  Here, Reverend Bailey was put on a final counseling based on an improperly loaded truck that he had no recollection of loading.  He was not apprised of this alleged improperly loaded truck until he returned from his termination even though there was ample time to do so.

Defendant also makes much of the fact that DG had no control of the timing in which the truck was reported.  However, DG's management knew that the truck could have been damaged based on defective straps and refused to make any investigation to determine the real reason as to why the truck was in its reported condition.  This refusal, Reverend Bailey contends, is directly linked to the EEOC complaint.  A jury could easily infer that this situation was their opportunity to finally get him and an investigation would have gotten in

the way.  This conclusion is supported by the fact that the Plant Manager, Roy Sandifer, told him that the

EEOC would not be able to help him the next time.  Smith also mentioned the EEOC complaint upon his return.

The claim that Donna Azar did not know of the EEOC complaint should be given no credence

whatsoever.  She is the same Donna Azar who made the  unbelievable claim about the 5-20 minute sermons

Reverend Bailey allegedly gave while the freight was backing up and shutting down the lines.  According to

James Kemp, a former loader, this did not happen.  Such a situation could not exist without counselings of any

kind.  She also claimed Theresa Winters reported the incident to her shortly after it happened, she was crying

shivering in her office, and Reverend Bailey prayed to save her from her sinful ways.  All of this incredible

testimony is on the record and there is absolutely no proof of same.  In fact, the evidence shows that these

things did not happen.  Thus, her claim, that as the manager of the department in which Reverend Bailey

worked, when the HR manager and the Plant Manager knew, and despite the investigation that had to be

performed when the EEOC complaint was filed, is simply not to be believed.  Given the above, a jury could

easily determine that she is not to be believed.

While it is clear that the court cannot ordinarily make credibility determinations at the summary

judgment stage, the inconsistent and implausible testimony regarding material issues, indicates that  the jury

should determine the credibility of her testimony regarding other issues.  In this case, such a determination

should be made regarding Donna Azar's claim that she did not know about the EEOC complaint.  *Cf. Rivera v.

Ndola Pharmacy Corp.,* 497 F.Supp.2d 381, 391-92 (E.D. N.Y. 2007) (The plaintiff's admissions that she lied

about material issues in this case required that a credibility determination be made by the jury.)

Furthermore, even if this testimony is believed, there still remains the issue of whether or not

the EEOC complaint was considered by Roy Sandifer and/or Larry Smith in their decision not to

investigate Reverend Bailey's claim that he loaded the truck properly.

### C.  THE PROFFERED REASON FOR THE FIRING WAS PRETEXUAL

"Assuming the plaintiff is able to establish [her] prima facie case, the burden then shifts to the

defendant to demonstrate a legitimate nondiscriminatory purpose for the employment action."Aldrup v. Caldera, 274 F.3d 282, 286 (5th Cir. 2001). If the defendant satisfies this burden, the plaintiff must prove that the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose. *Id.* At the summary judgment stage, the nonmovant need only point to the existence of a genuine issue of material fact. *See Gee v. Principi,* 289 F.3d 342 , 345 (5th Cir. 2002).

Based on the above, there is certainly a genuine dispute as to whether or not DG would have followed its policy of providing a real investigation to determine the actual reason for the condition of the trailer had it not been for the filing of the EEOC complaint.  There is certainly a genuine dispute as to whether such an investigation would have taken place given the fact that it was known that the straps could break and cause the condition with the truck. Furthermore, there exists a genuine issue of fact as to whether such an investigation would have taken place when the statements about the EEOC complaint by the Plant Manager and the HR coordinator are taken into consideration.  From this evidence, when viewed in the light most favorable to Reverend Bailey and with all reasonable inferences and ambiguities construed in his favor, a " jury [could] infer that retaliation was the real motive." *See McCoy v. City of Shreveport* , 492 F.3d 551, 556 562  (5th Cir. 2007) (footnotes and internal quotation marks omitted).

### C.  THIS IS A MIXED MOTIVE CASE

Under the mixed-motive theory, Reverend Bailey can survive summary judgment if he can show that even though the reason proffered by DG is true, an impermissible reason was a motivating factor.  *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) For the reasons set forth above, this case clearly qualifies as a mixed motive case.  Consequently, this case is not appropriate for summary judgment based on the mixed-motive theory alone.

### IV.

## CONCLUSION

For the reasons set forth above, the Defendant has not met its burden to establish that no genuine issues of material exist.  Therefore, the Court should deny its motion for summary judgment.

**WHEREFORE, PREMISE CONSIDERED**, Plaintiff requests that the Court issue its order denying Defendant's Motion for Summary Judgment, and for such other, further, and different relief as the Court deems appropriate under the circumstances.

**RESPECTFULLY SUBMITTED,** this 31st day of May, 2010.

**REVEREND LOUIS BAILEY, PLAINTIFF**

By: **/s/** Ottowa E. Carter, Jr

**OTTOWA E. CARTER, JR.,MSB # 8925,**
**Attorney for Plaintiff**

 **OF COUNSEL:**

**OTTOWA E. CARTER, JR., P.A.**
**801 E. Northside Drive - Suite C**
**P. O. Box 31**
**Clinton, MS 39060-0031**
**Tel: (601) 910-5001**
**Fax: (601) 910-5003**

## CERTIFICATE OF SERVICE

_____I, Ottowa E. Carter, Jr., do hereby certify that I have this day, I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of such filing to the following:

Edward F. Harold, Esquire
Fisher & Phillips LLP
201 St. Charles Avenue, Suite 3710
New Orleans, LA 70170

**SO CERTIFIED**, this 31st day of May, 2010.

/s/ Ottowa E. Carter, Jr.

**OTTOWA E. CARTER, JR.**